290 A.2d 850.

STATE *vs.* EDWARD J. BEAULIEU.

MAY 16, 1972.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

114

JOSLIN, J. The defendant was tried and convicted by a jury in the Superior Court upon an indictment which charged him with having made an indecent assault and battery upon the body of a young girl named Pamela, then under the age of 13 years, in violation of G. L. 1956, §11-37-6. The case is now here on the defendant's bill of exceptions, and he presses his exceptions to the trial justice's refusal to pass the case, to the denial of his motions for a directed verdict and for a new trial, to certain portions of the trial justice's instructions to the jury and to other rulings of the trial justice.

It appears from the record that at about 4 p.m. on June 13, 1968, Pamela, then aged 11½, and her younger sister were walking along the driveway leading to their home in the town of South Kingstown when an automobile came abreast of them. The vehicle stopped close to the girls, and the operator asked directions on how to get to the Peace Dale Processing Plant. During the conversation he left the vehicle and approached to within a few feet of Pamela. After about three minutes of questioning he said "Thank you," and then, without warning, he reached up under Pamela's dress. His hand touched her abdomen somewhere in the area of the navel and about "three inches above the top of [her] legs in the middle." Pamela screamed, whereupon the operator returned to his car and drove off. Pamela then went directly to her residence. Her parents were not at home and so she could not then tell them what had happened. She did, however, make the following written notation about her encounter. "BZ 235 gray and white car, Eddy, green uniform like gas station guys, raggedy, sewed in several places, dirty hands."

Later that afternoon the police were notified of the happenings. Following a police broadcast describing defendant and the automobile he was driving, a state police officer informed the South Kingstown police that earlier that afternoon he had seen both the person and the vehicle described in the broadcast in the South Kingstown area.

The defendant was arrested that evening or early the following morning. The police told him that a lineup was to take place and asked him whether he wanted his attorney present. When he responded affirmatively, the police telephoned the attorney's office and were advised by the attorney's secretary that he was in court.

The evidence as to what followed is conflicting. The police version is that the secretary informed them that a prior court engagement prevented her employer's attend-

ance at the lineup and that he was agreeable to their proceeding without him. The attorney, on the other hand, testified that he instructed his secretary to tell the police that he could not attend the lineup at the time planned, and that he would contact them as soon as circumstances permitted. In any event, the attorney was not present at the lineup. At the trial the trial justice refused to admit any evidence concerning what happened at the lineup, but he did permit Pamela, over objection, to make a courtroom identification of defendant.

The defendant's first assignment of error is to the trial justice's denial of his motion to pass the case. In point of time that motion preceded the impanelling of the petit jury in this case and it followed a charge given by the trial justice to a grand jury in the presence of some of the petit jurors who thereafter sat on defendant's jury. The portion of that charge which defendant argues made it impossible for those sitting on his jury who heard it to give him a fair trial was the following:

"To justify the finding of an indictment you must be convinced, so far as the evidence before you goes, that the accused is guilty. You ought not to find an indictment unless, in your judgment, the evidence before you, unexplained and uncontradicted, would warrant conviction by a petit jury."

That language, defendant argues, makes an indictment synonymous with guilt, and therefore unduly and prejudicially influenced the petit jurors and improperly induced them to believe that the mere fact that he had been indicted tainted the presumption of innocence in his favor.

In denying defendant's motion to pass the case, the trial justice observed that defendant had taken a single expression in his grand jury charge out of context and that he had ignored other portions of his charge where the grand jurors were told that in the proceedings before them, unlike those prevailing at trials, a prospective defendant

is denied the right to appear in person, to be represented by counsel, and to produce witnesses in his own behalf. For those reasons, he continued, there was much less chance for a defendant to be found guilty by a petit jury than there was for him to be indicted by a grand jury.

It is highly doubtful, in our judgment, that the petit jurors who heard the trial justice's instructions to the grand jury could have been misled by the isolated language which defendant has culled from those instructions. And even in the unlikely event that those jurors might have been confused, we think that the confusion was resolved by the trial justice's subsequent instructions to the defendant's petit jury. In that charge he explained that an indictment has no evidentiary value for either the state or the defendant and emphasized that the presumption of innocence, notwithstanding a prior indictment, remained with defendant until the state established that he was guilty of the offense charged beyond a reasonable doubt. It seems abundantly clear, and we now hold, that any potential for prejudice inhering in the grand jury instructions was completely dissipated by the trial justice's charge to the petit jury.

The defendant, noting that his retained counsel was not present at the police station pre-trial lineup, next argues that his absence so tainted Pamela's subsequent courtroom identification of him as her assailant as to make that evidence inadmissible. The logical starting point for any discussion of this argument is, of course, *United States* v. *Wade*, 388 U. S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and its companion cases *Gilbert* v. *California*, 388 U. S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) and *Stovall* v. *Denno*, 388 U. S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

While the Supreme Court in those cases agreed that the fifth amendment affords no shelter to a suspect who is

exposed to a lineup, it likewise recognized that any procedure which permits the state to compel a confrontation "* * * between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *Wade, supra* at 228, 87 S.Ct. at 1933, 18 L.Ed.2d at 1158. The Court, in a remark that pertains to this case, then went on to say that "the impediments to an objective observation are increased when the victim is the witness." *Id.* at 230, 87 S.Ct. at 1934, 18 L.Ed.2d at 1159.

In an attempt to deal with the vices associated with lineups, the Court then announced new lineup guidelines which protect the interests of society and at the same time assure a suspect of his right to a fair trial. Henceforth, it said, a lineup should be considered a critical stage in the prosecutorial process at which a suspect is entitled to be represented by counsel, and that evidence adduced at a lineup conducted without defense counsel in attendance, absent an intelligent waiver, should be excluded. Moreover, the Court said, a courtroom identification following an illegal lineup will be looked upon as the fruit of a tainted tree and therefore inadmissible in evidence unless the prosecution first establishes by clear and convincing evidence that the courtroom identification has an independent origin, that is, that it is based upon the witness' observation of the suspect other than at the pre-trial lineup. *Id.* at 236-40, 87 S.Ct. at 1937-39, 18 L.Ed.2d at 1162-65.

In this case the trial justice scrupulously observed both the letter and the spirit of the *Wade* rules. Initially, after an extensive evidentiary hearing conducted in the jury's absence, he faulted the pre-trial lineup on several grounds including the failure of the police to afford defendant a meaningful opportunity to be represented by counsel at

that critical stage of these proceedings. Then, having determined the primary illegality of the lineup, he reviewed the evidence in order to decide whether the prosecutrix' courtroom identification of defendant as her assailant had "been come at by exploitation of that illegality" or, whether it had instead been obtained "by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 241, 87 S.Ct. at 1939, 18 L.Ed.2d at 1165, citing *Wong Sun* v. *United States,* 371 U. S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963).

In seeking to make that determination on the facts before it, the Court in *Wade* enumerated some of the factors which merit consideration in evaluating a courtroom identification:

> "the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, the lapse of time between the alleged act and the lineup identification." *Id.* at 241, 87 S.Ct. at 1940, 18 L.Ed.2d at 1165.

In the case before us today the trial justice considered similar, but contextually more relevant, factors such as: the prosecutrix' two-to-three minute face-to-face confrontation with defendant prior to the assault and her recollection, as well as her written notation, concerning the color and registration of his automobile, and his attire and appearance.

Relying upon those circumstances as well as upon the relevant *Wade* criteria, the trial justice concluded that Pamela's courtroom identification of defendant did not stem from nor was it colored by the illegal pre-trial lineup. He found that it had an independent source, that it would have been made even if there had been no inter-

vening lineup, and that it was therefore admissible. We agree with his approach to the problem as well as with his conclusion.

The defendant next challenges the trial justice's refusal to allow him to roll up his sleeve and bare his left arm below the elbow. That request was made after Pamela had testified that on the day of the assault she had not observed that defendant's arm was tattooed. When that request was denied, defendant, in an attempt to cast a shadow on the reliability of the prosecutrix' identification of her assailant, offered to prove that his left arm was tattooed. He failed, however, to include in his offer a statement that the tattoo was there on the day of the assault. Absent such a showing the fact that his arm was tattooed on the day of the trial was completely irrelevant to any issue in the case and his request to bare his arm was properly rejected.

We next come to defendant's contentions that it was error for the trial justice to deny his motions for a directed verdict and for a new trial. And in conjunction with those assignments of error we also consider his exception to a portion of the trial justice's instructions to the jury. All three have as a common denominator the premise that an assault and battery on a child under the age of thirteen, to be "indecent," must be accompanied by an intention "to gratify a sexual desire" and that merely reaching under a young girl's dress and touching her abdomen is not "indecent" within the purview of the statute which makes it a crime to commit "an indecent assault and battery."

Defendant has cited no authority directly supporting his view. He has, however, called our attention to *Markiton* v. *State*, 236 Ind. 232, 139 N.E.2d 440 (1957). There the crime charged was not an indecent assault, but "assault and battery — sex," a necessary element of which, the court said, was the intent "to gratify sexual desires or to

frighten the child." *Id.* at 236, 139 N.E.2d at 441. See also *McDonald* v. *State,* 254 Ind. 645, 261 N.E.2d 852 (1970). This type of crime is clearly distinguishable from the more general offense of indecent assault with which the defendant here has been charged. With regard to the latter offense, the majority of courts have held that an assault upon a child is indecent if it is so offensive as to affront community standards and such as the common sense of society would regard as immodest, immoral and improper. *Dekelt* v. *People,* 44 Colo. 525, 99 P. 330 (1909); *State* v. *Minns,* 80 N.M. 269, 454 P.2d 355 (Ct. App. 1969); *State* v. *Holte,* 87 N.W.2d 47, 49 (N.D. 1957); *State* v. *Fischer,* 57 Wash.2d 262, 356 P.2d 983 (1960); *State* v. *Hoffman,* 240 Wis. 142, 2 N.W.2d 707, 709 (1942). In our judgment this view is sound, and we hold that an intention to "gratify a sexual desire" is not a necessary concomitant of an indecent assault.

As a corollary to his general contention with respect to the meaning of the word "indecent" defendant finally argues that the charge that he indecently assaulted Pamela is so vague that it failed fairly to apprise him of the particular acts constituting the offense. That kind of charge is a familiar one in the obscenity field and was disposed of in *Roth* v. *United States,* 354 U. S. 476, 491-92, 77 S.Ct. 1304, 1312-13, 1 L.Ed.2d 1498, 1510-11 (1957) where the Court said:

> "Many decisions have recognized that these terms of obscenity statutes are not precise. This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. '* * * [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. * * *' *United States* v. *Petrillo,* 332 U. S. 1, 7-8. These words, applied according to the proper standard for judging obscenity,

already discussed, give adequate warning of the conduct proscribed and mark "* * * boundaries sufficiently distinct for judges and juries fairly to administer the law * * *. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. * * *' *Id.*, at 7 [citations omitted]."

In a similar vein and discussing a statute making "open and gross lewdness and lascivious behaviour" a criminal offense, the Vermont court said:

"No particular definition is given, by the statute, of what constitutes this crime. The indelicacy of the subject forbids it, and does not require of the court to state what particular conduct will constitute the offence. The common sense of community, as well as the sense of decency, propriety and morality, which most people entertain, is sufficient to apply the statute to each particular case, and point out what particular conduct is rendered criminal by it." *State* v. *Millard*, 18 Vt. 574 (1846).

That statement, made more than a century ago, still provides a sufficient answer to defendant's argument. *State* v. *Minns*, 80 N.M. 269, 454 P.2d 355 (Ct. App. 1969); *Dekelt* v. *People*, 44 Colo. 525, 99 P. 330 (1909).

The defendant's exceptions are overruled and the case is remitted to the Superior Court for further proceedings.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, *Henry Gemma, Jr.,* Special Asst. Attorney General, for plaintiff.

*Anthony R. Berretto,* for defendant.