IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 14, 2015 Session

**STATE OF TENNESSEE v. JAMES DENVER CASE**

**Direct Appeal from the Circuit Court for Dickson County
No. 22CC-2012-CR167     Robert Bragg, Judge**

**No. M2014-00949-CCA-R3-CD – Filed November 24, 2015**

A Dickson County Circuit Court Jury convicted the appellant, James Denver Case, of first degree felony murder, aggravated robbery, a Class B felony, and aggravated burglary, a Class C felony, and the trial court immediately sentenced him to life in prison for the murder conviction. After a sentencing hearing, the trial court sentenced him to eight years for aggravated robbery and three years for aggravated burglary with all of the sentences to be served concurrently. On appeal, the appellant contends that the evidence is insufficient to support the convictions, that the trial court erred by instructing the grand jury in the presence of the jury venire, and that the trial court erred by allowing the deliberating jury to view a video in the courtroom without the appellant's being present. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Michael J. Flanagan, Nashville, Tennessee, for the appellant, James Denver Case.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Wendall Ray Crouch, Jr., Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In April 2012, the Dickson County Grand Jury indicted William Dallas Forrester, Angela Marie Warner, and the appellant for the first degree felony murder of John Edward Travierso, Sr.; the aggravated robbery of his son, John Edward Travierso, Jr.; and aggravated burglary.[1] The appellant was tried separately from his codefendants.

At trial, Trina Travierso testified that she was the victim's wife and that they married in 1981 when they were both seventeen years old. At the time of the victim's death, his mother had Alzheimer's, and he cared for her in the Travierso home full time. On the night of October 22, 2011, Trina Travierso got home from work about 7:30 p.m. The victim left about fifteen minutes later and was gone less than one hour. Mrs. Travierso helped the victim's mother get ready for bed and knew the victim was home because she heard him talking with their son. Mrs. Travierso went into her bedroom to put on her pajamas and heard "something kind of like a scuffle." She then heard the victim say, "'[G]et the [f***] out of my house.'" Mrs. Travierso knew from the victim's tone that something was wrong, stepped from her bedroom into the hallway, and saw someone standing at the end of the hallway. She said that the person was "backlit because the living room light was on but the hallway was dark" and that she saw the person pointing something at her. The person yelled for her to get down, but she stepped back into her bedroom. She heard three gunshots and someone say, "'[O]h, [f***].'"

Mrs. Travierso testified that she heard the front door slam and that her son came into the bedroom and told her to call the police because the victim had been hurt. She went into the kitchen, saw the victim on his knees, and began dialing 9-1-1. The victim showed her that he had been shot in his abdomen and told her that he was dying. The victim was transported to a hospital and underwent surgery but did not survive.

Mrs. Travierso testified that the person in the hallway was dressed in all-black clothing, including black gloves and black "head gear" with two eyes but no mouth "cut out." She later said the person "possibly [had] some red in the front." Mrs. Travierso stated that she was five feet, three inches tall and that the person was slightly taller than she. She saw only one person, and none of her personal property was taken. Mrs. Travierso said that she had never sold marijuana but that her son had sold it and that "[h]e had a lot of friends coming over."

Officer Wes Boker of the Dickson Police Department (DPD) testified that he was dispatched to the Travierso home on October 22 and was the first officer on the scene. He arrived at 8:41 p.m., and it was dark outside. Officer Boker said that a young man, John Edward Travierso, Jr., was sitting on the front porch and was screaming and crying for Officer Boker to help his father. Officer Boker tried to calm Travierso, Jr., and waited

---

[1] Although Travierso, Sr., and Travierso, Jr., are both victims in this case, we will refer to the victim of the felony murder as "the victim" and the victim of the aggravated robbery by his surname to avoid confusion.

for backup. As soon as another officer arrived, the officers went inside the home. The victim and his wife were in the kitchen. The victim was lying on his back, and his wife was kneeling beside him. Almost immediately, Officer Boker noticed the strong odor of pepper spray. He said he helped search the residence and secure the scene, and he acknowledged finding drug paraphernalia owned by Travierso, Jr.

On cross-examination, Officer Boker acknowledged that according to his report, Travierso, Jr., was standing on the front porch when he arrived and "somewhat calmly" asked for the officer to help his father. Officer Boker said Travierso, Jr., was crying but "wasn't very upset." Travierso, Jr., told Officer Boker that before the officers arrived, he was "ditching some dope out the door."

Detective James Lyell of the DPD testified that on October 22, 2011, he was dispatched to a home on Robin Hood Road. He arrived at 10:06 p.m., and the victim had been removed from the scene. Detective Lyell spoke with Trina Travierso and Travierso, Jr., but neither was able to identify the intruders. Another officer had found drug paraphernalia in the yard, and Detective Lyell asked Travierso, Jr., if he had been involved in selling drugs that night. Travierso, Jr., said no, and Detective Lyell ultimately determined that he was not involved in the shooting. However, Travierso, Jr., had been posting photographs of "wads of cash" and marijuana on his cellular telephone, which "made him a target."

Detective Lyell testified that he found three bullets on the kitchen floor and sent them to the Tennessee Bureau of Investigation (TBI) Crime Laboratory. The Crime Lab later reported that the bullets were "'38 357 caliber semi-jacket hollow point'" and that they were "consistent with a Winchester manufacture.'" Detective Lyell had received "a tip" that William Forrester was involved in the shooting and that Forrester had purchased the ammunition at Walmart. Forrester's date of birth was February 25, 1982, and he was the appellant's half-brother. Detective Lyell contacted Walmart and requested information about Forrester's purchase. On November 22, 2011, Detective Lyell received Forrester's receipt and a video showing him purchasing the bullets. Detective Lyell had spoken with the appellant before he obtained the video, and the appellant had claimed that he did not know Travierso, Jr.

Colleen Lewis, an asset protection associate for Walmart, testified that sometime after October 22, 2011, she spoke with Detective Lyell. Based on their conversation, Lewis "looked up the electronic journal for a receipt." The receipt was for the purchase of "38 special, jagged . . . hollow points" on October 20, 2011, and the purchaser's date of birth was "2-25- '80 something."

Twenty-year-old John Edward Travierso, Jr., testified that he was eighteen years old on October 22, 2011. That night, he and the victim were standing in the kitchen when two men "burst[]" through the front door in the living room. The men were wearing

black clothing and masks that completely covered their faces. One of them was holding a gun, and they demanded that Travierso, Jr., and the victim get onto the floor. Travierso, Jr., did as he was told, but the victim told the men to get out of his house. One of the men kept ordering the victim onto the floor, but the victim refused. The second man "came around from behind" the victim, sprayed the victim with pepper spray, and walked down the hallway toward Mrs. Travierso's bedroom.

Travierso, Jr., testified that the victim wiped the pepper spray from his eyes and tried to hit the man who was holding the gun. The man hit the victim, and the victim fell back into the kitchen. Travierso, Jr., heard three or four gunshots, and the two intruders ran out the front door. Travierso, Jr., said he ran to his bedroom, gathered all of his "paraphernalia junk," and threw it out the back door. He stated, "I don't know what I was thinking honestly. If I could take back - [that's] not what I'd [be] doing the last few seconds that I'd see my father." He stated that he later discovered that his iPod and about one ounce of marijuana were missing. The marijuana had been in a jar in the headboard of his bed. He acknowledged that he sold marijuana out of the house and said that he was "pretty sure" his parents knew about it. However, they never confronted him about his selling marijuana.

Travierso, Jr., testified that one of the robbers was five feet, nine inches to six feet tall and that the shooter was "a little bit taller." He said the entire incident lasted about two minutes. After the shooting, the victim asked his son for a pillow, so Travierso, Jr., got a pillow off the living room couch, and Mrs. Travierso put it under the victim's head. Travierso, Jr., acknowledged knowing Casey Thompson and said that Thompson had been "a buddy of mine." A couple of days before the shooting, Travierso, Jr., was going to sell marijuana to Thompson. When Thompson arrived at the Travierso home, the appellant was with him. Thompson walked up to the house and told Travierso, Jr., that the appellant wanted him to "come out to the car." Travierso, Jr., noticed that the appellant had backed his car into the driveway, thought the situation "seemed fishy," and refused to go to the car. Eventually, the appellant came to the front door of the home. However, the appellant did not want to come inside, and Travierso, Jr., would not sell drugs on the front porch, so the appellant and Thompson left. Travierso, Jr., said he did not know Forrester or Warner.

On cross-examination, Travierso, Jr., testified that he had "different customers" and that some of them knew he kept marijuana in his bedroom. He acknowledged that selling marijuana was a "dangerous business" and that he worried about being "ripped off." After the shooting, Traiverso, Jr., gave Detective Lyell a list of people who could have been responsible. He acknowledged giving a statement to the police after the shooting and describing one of the robbers as five feet, nine inches tall and the other as five feet, two inches tall. He said that regardless of their heights, the taller man was the shooter. He said he also thought the shooter had braids but that "I don't know why." After the shooting, Thompson was concerned that Travierso, Jr., thought Thompson was

involved.

Twenty-year-old Casey Thompson testified that he went to high school with Travierso, Jr., and that he lived in the same neighborhood as the appellant when they were growing up. On October 19, 2011, Thompson took the appellant to the Travierso home to buy marijuana. However, after Travierso, Jr., refused to sell marijuana to the appellant, the appellant told Thompson that he was going to rob Travierso, Jr. Thompson told the appellant not to rob him because he was Thompson's "pot dealer."

Thompson testified that on the night of October 22, 2011, he went to a birthday party and spent the night at a friend's house. The next day, the appellant came to his home and told him that the appellant and Forrester had gone to the Travierso home, that that the victim had "put up a fight," and that the appellant had sprayed the victim with pepper spray. The appellant claimed that he ran to Travierso, Jr.'s bedroom to get the marijuana and heard two gunshots. The appellant did not tell Thompson that anyone had been shot. Thompson said the appellant knew marijuana was in Travierso, Jr.'s bedroom because Travierso, Jr., had told them on October 19 that "we can go in my bedroom and do the deal." Thompson said that a few days after the shooting, the appellant told him that the victim had died. The appellant told Thompson that he was scared and that they did not mean to kill the victim.

On cross-examination, Thompson acknowledged that he became a suspect in this case and immediately told Detective Lyell about his alibi. He also acknowledged that Travierso, Jr., trusted him and that he did not warn Travierso, Jr., about the robbery. Thompson never saw Travierso, Jr., "flash money," but Travierso, Jr., never hid the fact that he was a marijuana dealer. When the appellant told Thompson about the robbery on October 23, Thompson did not go to the police. He said that he did not contact them because an indictment had been filed charging him with conspiracy to possess cocaine, and he did not want to go to jail. After Thompson learned about the victim's death, he texted Travierso, Jr., that "'I'm sorry for your [loss].'" However, he did not tell Travierso, Jr., that the appellant was involved in the shooting. Thompson said he turned himself in to the police when he learned he was a suspect in this case.

On redirect examination, Thompson testified that he turned himself in on October 31, 2011. The appellant did not go to the police but seemed remorseful to Thompson.

Twenty-four-year-old Paul Nathan Gerald testified that he and the appellant were friends and that he had known the appellant for twenty years. About October 24, 2011, the appellant came to Gerald's house and told him the following: On October 22, 2011, Angela Warner drove William Forrester and the appellant to the Travierso home. Forrester pushed open the door, and the two men went inside. The victim and Travierso, Jr., were standing in the kitchen, and Forrester and the appellant ordered them onto the floor. However, the victim "came at them," so the appellant hit the victim and sprayed

- 5 -

his face with pepper spray. The appellant then walked down the hallway and heard gunshots. He ran back to the living room, and Forrester was gone. Gerald said that he did not believe the appellant's story at first but that he later heard about the shooting on the news. He said he did not know the Traviersos.

On cross-examination, Gerald acknowledged that the day before his testimony, he talked with Casey Thompson in the hallway of the courthouse. He said that he was six feet, four inches tall and that he did not tell anyone about the appellant's confession because he did not think it was true. After he heard about the shooting on the news, though, he "started to freak out a little bit." Eventually, he told Detective Lyell what he knew because he "didn't want to get in trouble for just knowing about it."

Twenty-six-year-old Angela Warner testified that she dated the appellant's brother, William Forrester; that she and Forrester used to be engaged; and that she pled guilty in this case to conspiracy to commit second degree murder. Warner's guilty plea hearing transcript, introduced into evidence at the appellant's trial, reflects that she received a ten-year sentence. At Warner's guilty plea hearing, she told the trial court, "I drove the car that held . . . the guys that entered the victim's home." The trial court asked at the hearing if Forrester and the appellant were in the car, and Warner answered yes.

On cross-examination, Warner testified that she had been told she would receive a fifty-one-year sentence if she did not plead guilty and that she only pled guilty to avoid that sentence. On redirect examination, Warner testified that she was not in the Travierso house on the night of October 22 and did not know what happened.

The State recalled Detective Lyell, who acknowledged that the TBI Crime Lab report listed several types of guns that could have fired a thirty-eight-caliber bullet, including a revolver. He explained that when someone fired a revolver, the projectile moved through the barrel of the gun, but the shell casing remained in the gun. Detective Lyell did not find any shell casings at the crime scene and thought that a revolver was used to shoot the victim. Detective Lyell interviewed the appellant a couple of weeks after the shooting, and the appellant denied robbing anyone. Detective Lyell said he had not mentioned a robbery to the appellant. The appellant claimed that he did not know anything about the victim's death and that he did not know why he was being interviewed. The appellant also claimed that he did not have any friends. However, Detective Lyell had interviewed Paul Gerald and knew the appellant was lying. The appellant claimed not to know Travierso, Jr. On cross-examination, Detective Lyell acknowledged that he interviewed Forrester before he interviewed the appellant, that he discussed the robbery with Forrester, and that the appellant could have learned about the robbery from Forrester.

Dr. Bridget Eutenier of the Nashville Medical Examiner's Office testified as an expert in forensic pathology. Dr. Eutenier said she did not perform the victim's autopsy

but reviewed his autopsy report. According to the report, a bullet entered the left side of the victim's abdomen under his twelfth rib and perforated the left side of his diaphragm. The bullet lacerated his pancreas, stomach, liver, and the right side of his diaphragm before exiting his torso. The bullet traveled left to right, downward, and slightly front to back. The victim died on October 23, 2011, at 12:55 p.m. at Vanderbilt University Medical Center.

Dr. Eutenier testified that in addition to the victim's bullet wound, he had a bruise on his right eye. She described the bruise as a blunt force injury. Dr. Eutenier said that she reviewed the victim's autopsy photographs and also noticed a contusion and abrasion on the right side of his forehead. The victim's blood tested positive for methamphetamine, marijuana, cocaine, morphine, and midazolam. The latter two drugs were most likely products of resuscitation administered by medical personnel. No soot or gunpowder was on the victim's skin or clothing. Dr. Eutenier said that the victim's cause of death was a gunshot wound to the torso and that his manner of death was homicide.

Detective Lyell testified for the appellant that William Forrester was five feet, nine inches tall. The appellant was six feet, one inch tall.

At the conclusion of Detective Lyell's testimony, the jury convicted the appellant as charged of first degree felony murder, aggravated robbery, a Class B felony, and aggravated burglary, a Class C felony. The trial court immediately sentenced him to life in prison for the felony murder conviction. After a sentencing hearing, the trial court sentenced him as a Range I, standard offender to eight years for the aggravated robbery of Travierso, Jr., and three years for aggravated burglary and ordered that all of the sentences be served concurrently.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support his convictions, arguing only that the evidence does not support the jury's verdicts. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the

evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). Aggravated robbery is a robbery accomplished with a deadly weapon. Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103(a). Aggravated burglary is burglary of a habitation. Tenn. Code Ann. § 39-14-403(a). Burglary occurs when a person, without the effective consent of the property owner, enters a building other than a habitation not open to the public with the intent to commit a felony, theft, or assault. Tenn. Code. Ann. 39-14-402(a)(1).

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2); State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

Taken in the light most favorable to the State, the evidence shows that on October 19, 2011, Casey Thompson and the appellant went to the Travierso home in order for the appellant to buy marijuana from Travierso, Jr. Although the sale did not take place, the appellant learned from the incident that Travierso, Jr., kept the marijuana in his bedroom and told Thompson that he was going to rob Travierso, Jr. On the night of October 22, 2011, Warner drove the appellant and Forrester to the Travierso residence. Forrester and the appellant entered the living room and demanded that the victim and Travierso, Jr., get onto the floor. The victim refused, and the appellant sprayed him with pepper spray. The appellant or Forrester also hit the victim on his head, knocking him down, and the appellant went to Travierso, Jr.'s bedroom and took marijuana out of the headboard of his bed. Meanwhile, Forrester shot the victim in the abdomen. Soon after the crimes, the appellant told Thompson and Paul Gerald about his involvement, and Warner later admitted to driving Forrester and the appellant to the Travierso home on the night of shooting. The evidence is more than sufficient to support the appellant's convictions.

## B. Grand Jury Instructions

The appellant contends that the trial court committed reversible error by giving grand jury instructions in the presence of the jury venire. The State argues that the appellant has waived this issue by failing to make a contemporaneous objection and that he is not entitled to plain error relief. We conclude that the appellant did not waive the issue but that any error was harmless.

On the morning of jury selection, the trial court advised the jury venire that "things aren't going smoothly." The trial court told the potential jurors that the grand jury was meeting at the end of the hall, that some of the grand jurors had been unable to attend, and that "I'm going to have to pick two of you - excuse me three of you . . . that will take their place so the grand jury can proceed on." The trial court stated that after it picked the three grand jurors, it was going to release the remaining jury venire until noon. The trial court apologized for the inconvenience, stated that "this is the least worst alternative that we can come up with," and announced that prospective jurors twenty-one, twenty-seven, and five had been selected for the grand jury. The court told the two men and one woman to take "any of these seats right here," swore the three individuals, and instructed them, in relevant part, as follows:

> No person may be charged with a capital crime or a felony [except] upon an indictment or a presentment by the grand jury. The initial steps rest with the grand jury which is an independent body though acting under the direction and with the assistance of the Court. It is your duty to inquire carefully to reports of all violations of law and to see that those who willfully and defiantly break the law are brought to

trial.

> . . . .

> You will hear only one side of the case. It is not your duty to decide the guilt or innocence of the accused. It is your duty to determine whether there is sufficient evidence or probable cause to [require] an accused to stand trial. If the evidence fails to establish a probability of guilt you must refuse to return a true bill. Unjust or unfounded indictment[s] should not be returned against anyone.

> On the other hand it is equally important that indictments be returned against those who upon the evidence appear to be probably guilty of the commission of the crime. You must be fair and just in your deliberation to the best of your ability and understanding. You must be guided by an impartial spirit free from personal, social, racial, religious or political bias or favor.

> . . . .

> When the testimony satisfies you members of the grand jury that an offense has been committed and identifies the offender, then you should report the offense by either indictment or presentment.

> . . . .

> Where twelve concur the foreman shall endorse the words "A True Bill" upon the indictment or presentment. The indictment or presentment with the endorsement of the action of the grand jury by the foreman must be returned in the presence of all grand jurors.

At the conclusion of the instructions, the court advised the three grand jurors to "go into the jury room and have a seat, I'll send you down in just a few minutes." The trial court then continued as follows:

> Now you ladies and gentlemen who are on the jury, I'm going to ask you, if you will, we're going to have some proceedings in the case that is going to start when you come back at 12:00 but it is one of those out of hearing of the jury things; so I

> need you to clear the courthouse. If you make plans to be back here right at 12 o'clock and come right back up here and have a seat where you are now.
>
> . . . .
>
> Ladies and gentlemen of the jury, you may be excused at this time. Thank you.

The transcript reflects that the potential jurors left the courtroom and that the trial court and counsel addressed other matters related to the trial. Finally, defense counsel stated,

> And I'd like to make an addition[al] motion at this point, an oral motion. I'll reduce it to writing. This will be the third Motion to Strike the Venire and I don't believe the Court Reporter was - I don't believe it was on the record when you were charging the grand jurors; and I probably - if I had thought about it, I'd ask that the panel be excused; but I'm going to move to strike the venire because the Court in giving the instruction and in a moment I'm going to ask that the instructions be made part of the record.
>
> Part of the instruction tells the grand jurors, and I'm paraphrasing, that an [indictment means] that a person is probably guilty; and we can look at the exact language; but that has not been disseminated to the jury panel that an indictment in and of itself means that a defendant is probably guilt[y] because they heard you charge the grand jury that.

The trial court denied the motion and ordered a recess until after lunch. When court resumed, voir dire began, and the petit jury was selected.

Both the United States and Tennessee Constitutions guarantee a criminal defendant the right to a trial by an impartial jury. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." State v. Adams, 405 S.W.3d 641, 650 (Tenn. 2013). Moreover,

> When a jury has been subjected to either extraneous prejudicial information or an improper outside influence, the validity of the verdict is questionable. . . . [E]xtraneous prejudicial information is information in the form of either

- 11 -

fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case. An improper outside influence is any unauthorized private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury.

Id. at 650-51 (internal citations and quotations omitted). The party challenging the validity of the verdict must show that the jurors were exposed to extraneous prejudicial information or improper outside influence. Id. at 651. As our supreme court has explained,

> [O]nce the challenging party has made the initial showing that the jury was exposed to extraneous prejudicial information or an improper outside influence, a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless.

Id.

The State notes that the appellant has failed to cite any cases standing for the proposition that the jury venire's presence during a grand jury charge regarding an unrelated case warrants reversal and states that "[n]or has the State discovered such a case." However, the State cites Harris v. State, 534 S.W.2d 868 (Tenn. Crim. App. 1975), as "[t]he closest opinion on the subject." In Harris, the defendant, who was on trial for possession of marijuana for resale, argued that the trial court erred by refusing to dismiss the petit jury when another trial judge instructed the grand jury, in the presence of the petit jury, "rather forcefully on the subject of drug offenses." 534 S.W.2d at 871. This court found that the defendant was not entitled to relief because "[n]o prejudice was developed on voir dire, none has been documented post-trial, and the defendant took the jury with peremptory challenges left." Id.

Although we have been unable to find any Tennessee cases on point, cases in other jurisdictions are helpful. In Gordon v. United States, 384 F.2d 598, 599 (8th Cir. 1967), the record established that the trial court instructed the grand jury in the presence of "at least a substantial number of the petit jurors." During the instructions, the court stated that "'you ought not return an indictment unless the accused is guilty.'" 384 F.2d at 600. Defense counsel challenged the jury panel, and the trial court immediately gave a curative instruction, telling the petit jurors that "the instructions given were for the grand jury alone and that the court did not intend to create any impression that it is necessary to convict any person indicted and that if the jurors got such impression, to strike it out of their minds completely." Id. The court also instructed the petit jury at the close of the evidence regarding the State's burden of proof, that "'the indictment constitutes no

evidence of any character in this case against the defendant,'" and that the jury was not to consider the indictment during deliberations of the defendant's guilt.  Id.

On appeal, the Eight Circuit concluded that the trial court's instructing the grand jury in the presence of the petit jury did not constitute error per se.  Id.  The court also concluded that the defendant had failed to show prejudicial error because defense counsel "admitted that he was afforded a full opportunity to examine the individual jurors and that he made no attempt to ascertain from the jurors the effect, if any, of the grand jury instructions upon them."  Id.  The court noted that the problem could have been avoided by excluding the petit jury from the courtroom during the instructions but stated that the grand jury instructions were "entirely proper and when fairly considered as a whole, they do not afford any reasonable basis for creating an impression that an indictment should be given any weight in determining the guilt or innocence of a defendant."  Id.  Further, the appellate court found that the trial court took "prompt action" to cure the error and that the final jury instructions eliminated any reasonable possibility that the defendant was denied his right to a fair trial.  Id. at 601.

Similarly, in State v. Beaulieu, 290 A.2d 850, 851-52 (R.I. 1972), the trial court instructed the grand jury, in the presence of some of the petit jurors, that "'[t]o justify the finding of an indictment you must be convinced, so far as the evidence before you goes, that the accused is guilty.  You ought not to find an indictment unless, in your judgment, the evidence before you, unexplained and uncontradicted, would warrant conviction by a petit jury.'"  On appeal, the defendant argued that the court's instruction "makes an indictment synonymous with guilt" and tainted his presumption of innocence.  Id. at 852.  In concluding that the trial court properly denied the defendant's motion to "pass the case," the Rhode Island Supreme Court stated,

> It is highly doubtful, in our judgment, that the petit jurors who heard the trial justice's instructions to the grand jury could have been misled by the isolated [language] which defendant has culled from those instructions.  And even in the unlikely event that those jurors might have been confused, we think that the confusion was resolved by the trial justice's subsequent instructions to the defendant's petit jury.  In that charge he explained that an indictment has no evidentiary value for either the state or the defendant and emphasized that the presumption of innocence, notwithstanding a prior indictment, remained with defendant until the state established that he was guilty of the offense charged beyond a reasonable doubt.  It seems [abundantly] clear, and we now hold, that any potential for prejudice inhering in the grand jury instructions was completely dissipated by the trial justice's charge to the petit jury.

Id.

In another Eighth Circuit case, <u>United States v. Harper</u>, 466 F.3d 634, 641 (Eighth Cir. 2006), the trial court stated to potential jurors during voir dire that "'there is probable cause or an indictment wouldn't be returned'" and that "'an indictment is merely a formal legal proceeding but it's based upon probable cause that the crimes have been committed and somehow the defendant is involved with it.'" However, the court also stated that the indictment was not an indication of guilt and asked if the prospective jurors could still be fair and impartial. 466 F.3d at 641. One potential juror indicated that he could not be fair, defense counsel challenged him for cause, and the court excused him from the panel. <u>Id.</u> After jury selection, the court instructed the petit jury that the indictment was "simply an accusation," that the defendant was presumed innocent until proven guilty beyond a reasonable doubt, and that the jury was to decide the defendant's guilt based on the evidence presented. <u>Id.</u> at 642. Moreover, during the final jury charge, the court reiterated that the indictment was "simply an accusation" and "not evidence of anything" and that the government had to prove its case beyond a reasonable doubt based on the evidence presented at trial. <u>Id.</u>

On appeal, the defendant argued that the trial court's statements to the jury venire regarding probable cause and the indictment "divested him of the presumption of innocence." <u>Id.</u> at 645. Reviewing the issue for plain error because the defendant failed to object at trial, the appellate court noted that the trial court's statements regarding probable cause were correct statements of the law. <u>Id.</u> at 644. However, the court expressed concern in that the statements "came from the judge, the most authoritative figure in the courtroom." <u>Id.</u> at 646. Nevertheless, the appellate court refused to grant plain error relief, stating that the jurors were presumed to follow the instructions of the trial court and that "any ambiguity or prejudice that resulted from the district court's statements was remedied when the court excused for cause the relevant panel member and proceeded to twice correctly instruct the jury on the presumption of innocence, that an indictment is not evidence and the government's burden of proof." <u>Id.</u> at 647.

Turning to the instant case, we will first address the State's argument that the appellant has waived this issue because he failed to make a contemporaneous objection. Although defense counsel did not immediately object to the court's instructing the grand jurors in the presence of the jury venire, he objected shortly thereafter and well-before voir dire began. Therefore, counsel objected in time for the trial court to take notice of any error and take the action necessary to correct the error. <u>See</u> Tenn. R. Crim. P. 36(a). Thus, we conclude that the appellant has not waived the issue.

We also conclude that the appellant has failed to show that the jurors were exposed to extraneous prejudicial information that bore on a fact at issue in the case. Defense counsel did not question the potential jurors during voir dire as to whether any of

them heard the grand jury instructions. In any event, during the trial court's preliminary instructions to the petit jury, it stated that "[t]he indictment is not any evidence of guilt. It is just the formal way that the state tells the defendant what crime he is accused of committing. It does not even raise any suspicion of guilt." The court further instructed the jury that the appellant was presumed innocent unless the State presented evidence to overcome that presumption and "convinces you beyond a reasonable doubt that he is guilty." During the final jury charge, the trial court again instructed the jury that the appellant was presumed innocent and that the presumption was not overcome "unless from all of the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty." The trial court stated throughout the final charge that in order to find the appellant guilty of any of the indicted or lesser-included offenses, the jury had to do so beyond a reasonable doubt. Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Thus, while not condoning the trial court's instructing the grand jurors in the presence of the jury venire, we conclude that any error was harmless. See Tenn. R. App. P. 36(b).

## C. Appellant's Absence During Video

Finally, the appellant contends that the trial court committed reversible error by allowing the deliberating jury to view a video in the courtroom without his being present. As in the previous issue, the State argues that the appellant has waived this issue because he failed to make a contemporaneous objection and that any error does not rise to the level of plain error. Again, we conclude that the appellant did not waive the issue but that any error was harmless.

The record reflects that after the jury retired from the courtroom to deliberate, the trial court and the attorneys discussed the jury's returning to the courtroom to watch a video played during the trial.[2] During the discussion, defense counsel stated that "the more I think about it I'm going to object to this procedure of having counsel in the presence of the jury when they are looking at it." Defense counsel suggested that "we somehow get a redacted version of that" and let the jury play the redacted video on a laptop computer in the jury room. The trial court stated that "it's not going to happen" and that "just bring the jury into open court and let them look at it." The court also stated, "If they come in open court to watch it, counsel can leave."

The record reflects that the jury entered the courtroom but does not reflect that counsel left the courtroom. The trial court then addressed the jury as follows:

---

[2] Although the trial court did not identify the video at issue, the only video played for the jury during the trial was a recording of the appellant's interview with Detective Lyell. The video was marked as exhibit seventeen but was not published to the jury, and the State advised the trial court that "[i]t needs to be viewed in the courtroom, Your Honor." During oral arguments, appellate counsel confirmed that the video at issue was the appellant's interview. We note that the video is not in the appellate record.

All right, ladies and gentlemen, according to your request we have cleared out as many of the personnel as I can legally do; and I understand your complaint about the roaring of the speakers but this is the absolute best we can do. We tried to put it on the other speakers and that didn't work.

I want you to remember that the people working the sound system went to law school. Okay. So we have no experts here. Of course, the sound is coming out of that speaker right there but if you want to get up and look, you know, get closer or, you know, kind of roam around that's okay. Either get up and stand near one of the speaker[s] or whatever you want to do because once we start the tape here nobody is going to say anything, the lawyers, me, anybody else.

Now if you want it to go back a little bit or something like that, if you'll just raise your hand and say go back a little bit, we'll try to do that. We'll try to play it over as many times as you want; but if you want to discuss it, stop, go back in the jury room.

The jury watched the video. At one point, one of the jurors requested that a portion of the video be replayed "just a little bit to hear what he said about whose name that was[.]" The requested portion of the video was replayed, and the jury returned to the jury room to continue its deliberations. At that point, defense counsel stated,

Your Honor, before we just went through this process we talked about allowing the jury to come in and watch a video that was in evidence and I object to that being done in the presence of counsel and in the absence of the defendant and the Court overruled my objection. I just wanted to put it on the record.

The court stated that the jury had been brought into the courtroom "for the purpose of watching the video only" and that "[n]o . . . . proceedings were done[.]" The court overruled counsel's objection.

The appellant contends that allowing the jury to view the video without his being present constitutes reversible error. A defendant has a fundamental right to be present during his or her trial. State v. Muse, 967 S.W.2d 764, 766 (Tenn. 1998) (citing U.S. Const. amends. V, VI, XIV; Tenn. Const. art. I, § 9). "For example, under the

- 16 -

Confrontation Clause, a defendant has the right to be present in order to confront witnesses and evidence against him." Matthew L. Moates v. State, No. E2003-01926-CCA-R3-PC, 2004 WL 1196085, at *9 (Tenn. Crim. App. at Knoxville, May 27, 2004) (citing United States v. Gagnon, 470 U.S. 522, 526 (1985)). Pursuant to the Due Process Clause, "a defendant has a right to be present 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" Id. (quoting Gagnon, 470 U.S. at 527) (additional internal quotations and citations omitted). Moreover, Rule 43(a), Tennessee Rules of Criminal Procedure, provides that "the defendant shall be present at . . . every stage of the trial, including the impaneling of the jury and the return of the verdict[.]"

Our supreme court has concluded that a defendant's being absent from the entire jury selection or the entire trial required automatic reversal. State v. Ballard, 21 S.W.3d 258, 262 (Tenn. Crim. App. 2000) (trial); State v. Muse, 967 S.W.2d 764, 766 (Tenn. 1998) (jury selection). Likewise, automatic reversal is required when a defendant is absent from almost all of jury selection. Robert Charles Taylor v. State, No. E2012-01625-CCA-R3-PC, 2013 WL 6797398, at *14 (Tenn. Crim. App. at Knoxville, Dec. 20, 2013). On the other hand, this court has held that any error regarding a defendant's being absent from jury selection for a short period of time was harmless. Curtis v. State, 909 S.W.2d 465, 469-70 (Tenn. Crim. App. 1995). In State v. Michael Lewis, W2002-0321-CCA-R3-CD, 2003 WL 1697689, at *6 (Tenn. Crim. App. at Jackson, Mar. 26, 2003), this court held that the trial court's conducting an ex parte proceeding at the conclusion of the first day of trial when neither the defendant nor his attorney were present did not result in prejudice to the defendant or the judicial process.

Turning to the instant case, we initially note that the State argues that the appellant has waived this issue because defense counsel did not object to the appellant's absence until after the jury viewed the video. Our careful review of the trial transcript reveals that prior to viewing the video, defense counsel objected to the jury's viewing the video with counsel present. Defense counsel did not mention the appellant. After the jury viewed the video, though, defense counsel "put it on the record" that he objected to the jury's viewing the video in the appellant's absence. Therefore, we can appreciate the State's argument that the issue has been waived. See Tenn. R. App. P. 36(a). However, this court has refused to conclude that a defendant waived his right to be present when the defendant failed to object to the State's moving to have him removed from the courtroom and the record did not reflect that the defendant personally waived his right to be present. See State v. Tommy Earl Jones, No. M2010-00976-CCA-R3-CD, 2011 WL 1631832, *8-9 (Tenn. Crim. App. at Nashville, Apr. 19, 2011), perm. to appeal denied, (Tenn. 2014). The appellant did not personally waive his right to be present in this case. Thus, we conclude that he has not waived the issue.

The State contends that the appellant is not entitled to relief because his absence did not substantially impair his defense. In support of its claim, the State cites Michael

<u>Lewis</u>. However, the appellant's absence here is quite distinguishable from the defendant's absence from the ex parte proceeding in <u>Lewis</u>. In the instant case, the appellant was absent while the jury was present in the courtroom, the court addressed the jury, and the jury reviewed the appellant's recorded statement to a police officer.

Ideally, "the jury shall take to the jury room for examination during deliberations all exhibits and writings, except depositions, that have been received in evidence." Tenn. R. Crim. P. 30.1. Moreover, regardless of whether the jury reviews the evidence in the jury room or the courtroom, it should do so in private. See <u>State v. Lemaricus Devall Davidson</u>, No. E2013-00394-CCA-R3-DD, 2015 WL 1087126, at *46 (Tenn. Crim. App. at Knoxville, Mar. 10, 2015). In this case, where the jury room was not equipped to play the video, the better practice would have been for the court officer to bring the jury into the courtroom without the presence of the judge or counsel. However, if the jury must review the evidence in the courtroom in the presence of the trial court and counsel, then we believe that the defendant also should be present. Under those circumstances, the jury's review of the evidence, particularly if the trial court communicates with the jury, may become a critical stage of the proceedings. See <u>State v. Michael J. Haynes</u>, No. 106,850, 2013 WL 3970167, at *6 (Kan. App., Aug. 2, 2013). In any event, the appellant was present when the jury viewed the video during the State's case. Further, when the jury viewed the video during deliberations, the proof in the case had closed and defense counsel was present. The appellant's absence from the overall trial was brief, he makes no allegation of prejudice, and nothing indicates that his absence had any effect on the outcome of his case. Therefore, we conclude that any error was harmless.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE